PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ELA GANDZIAMI-MICKHOU,
                              *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

                              *Respondent.*

No. 04-2428

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A96-087-201)

Argued: November 30, 2005

Decided: April 17, 2006

Before WILKINSON, KING, and SHEDD, Circuit Judges.

Petition for review denied by published opinion. Judge Shedd wrote the opinion, in which Judge Wilkinson and Judge King joined.

## COUNSEL

**ARGUED:** Stacie Lieberman, AMERICAN UNIVERSITY, Washington College of Law, Law Clinic, Washington, D.C., for Petitioner. Song E. Park, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent. **ON BRIEF:** Richard J. Wilson, Supervising Attorney, WASHINGTON COLLEGE OF LAW, International Human Rights Clinic, Washington, D.C., for Petitioner. Peter D. Keisler, Assistant Attorney

General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, Office of Immigration Litigation, Erica A. Franklin, Trial Attorney, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

SHEDD, Circuit Judge:

Ela Gandziami-Mickhou, a native and citizen of the Republic of Congo, was admitted to the United States in January 2002 as a non-immigrant student to attend Avila College in Kansas City, Missouri. After Gandziami-Mickhou failed to return to the college following the Spring 2002 semester, the Immigration and Naturalization Service ("INS") issued a Notice to Appear, charging her as removable for failing to comply with the conditions of her visa. Gandziami-Mickhou subsequently applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") denied Gandziami-Mickhou's applications, concluding that she failed to meet her burden of proof on each of her claims. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision under its streamlined process of review. Gandziami-Mickhou now petitions for review of the BIA's decision, arguing primarily that the IJ violated our decision in *Camara v. Ashcroft*, 378 F.3d 361 (4th Cir. 2004), by disregarding corroborating evidence that she submitted in her application for asylum and withholding of removal. For the reasons that follow, we deny the petition for review.

I.

Under the Immigration and Nationality Act ("INA"), the Attorney General has authority to confer asylum on any refugee. 8 U.S.C. § 1158(b). To qualify as a refugee, an alien must be unwilling or unable to return to her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The "well-founded fear of persecution" standard contains both subjective and objective components. *Chen v.*

*INS*, 195 F.3d 198, 201 (4th Cir. 1999). To satisfy the subjective component, an applicant must present "candid, credible, and sincere testimony demonstrating a genuine fear of persecution." *Id.* (internal quotations omitted). The objective component requires "specific, concrete facts that a reasonable person in like circumstances would fear persecution." *Id.* at 202. The applicant for asylum bears the ultimate burden of proving her status as a refugee. 8 C.F.R. § 1208.13(a) (2004).

To qualify for withholding of removal, an applicant must demonstrate a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 430 (1984). This is a more stringent standard than that for asylum. *Chen*, 195 F.3d at 205. Unlike the grant of asylum (where an alien is entitled to remain in the United States), withholding of removal merely bars the deportation of an alien to a particular country. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999). Further, while asylum is discretionary, if an alien establishes eligibility for withholding of removal, the grant is mandatory. *Id.* at 420.

To qualify for protection under the CAT, an applicant must prove that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). We have concluded that this standard for the CAT is independent from the standard for determining asylum, and an adverse credibility finding alone cannot preclude protection under the CAT. *Camara*, 378 F.3d at 372.

For purposes of review of a final order of removal issued under the streamlined process, the IJ's reasoning becomes the final BIA determination. *Id.* at 366. In reviewing the BIA's decision regarding an order of removal, whether streamlined or not, we uphold the decision if it is not "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C) (2004). Further, we give great deference to the factual findings by the BIA, as those factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* § 1252(b)(4)(B). For this reason, the substantial evidence test for review of the BIA's conclusions mandates affirmance if the evidence is not "so compelling that no reasonable factfinder could" agree with the BIA's factual conclusions. *Huaman-Cornelio v. BIA*, 979 F.3d 995, 999 (4th Cir. 1992). We also defer to the BIA's credibility find-

ings that are supported by substantial evidence. *Camara*, 378 F.3d at 367.

## II.

### A.

Gandziami-Mickhou seeks immigration relief based on her and her family's purported involvement with the Congolese Movement for Democracy and Integral Development (MCDDI). In the proceedings before the IJ, Gandziami-Mickhou presented evidence tending to show the following.

Gandziami-Mickhou's father was a successful businessman and a close friend of the MCDDI leader, Bernard Kolelas. Gandziami-Mickhou's father joined the MCDDI when it was created in 1989, and he also helped finance the organization. Gandziami-Mickhou joined the MCDDI in 1996 and soon became responsible for recruiting and mobilizing its younger members.

In October 1997, General Sassou Nguesso, a member of the Congolese Labor Party, overthrew democratically elected president Pascal Lissouba. Gandziami-Mickhou's family had lived across the street from Lissouba in Brazzaville, Congo's capital city. Nguesso implemented a dictatorship and began oppressing political opponents. Gandziami-Mickhou's husband's uncle was a minister within Lissouba's government, but he went into exile when Nguesso overthrew the government. Gandziami-Mickhou's family also fled Brazzaville when Nguesso took control. When Gandziami-Mickhou's family returned to Brazzaville in January 1998, they moved to a different neighborhood.

Gandziami-Mickhou was twice recognized as a member of an opposition party. In October 1998, a colonel in Nguesso's army threatened Gandziami-Mickhou and asked her why she was not in exile. The colonel stated that he would come back for her. Two months later, war broke out in Brazzaville, and Gandziami-Mickhou fled into the forest where she lived for several months without sufficient food and water. Occasionally soldiers from Nguesso's military

would harass the families hiding in the forest, and they severely beat Gandziami-Mickhou's brother.

In April 1999, a refugee camp in the neighboring Democratic Republic of Congo accepted Gandziami-Michkou, and she stayed in the camp for five months before returning to Brazzaville. When Gandziami-Mickhou returned to Brazzaville, she discovered that her family's house had been burned. Neighbors told Gandziami-Mickhou that it had been intentionally destroyed by Nguesso because of her family's political opposition.

In March 2001, Gandziami-Mickhou was abducted from her home in the middle of the night by armed men in uniform. Gandziami-Mickhou knew the men were part of Nguesso's army from the way they talked and dressed. The men detained Gandziami-Mickhou in a tiny room with four other women for two weeks and repeatedly raped her because she supported Kolelas. When Gandziami-Mickhou initially resisted, a guard beat her with his belt, leaving a scar. Gandziami-Mickhou was released after she became sick. After recovering, Gandziami-Mickhou attempted suicide by overdosing on pills.

Because of these events, Gandziami-Mickhou's father suggested she leave Congo for a while. Gandziami-Mickhou began looking at schools in the United States and was eventually accepted to Avila College. Gandziami-Mickhou's father agreed to pay for her tuition. Before she left for the United States, Gandziami-Mickhou's family received threatening letters directed at her father.

Gandziami-Mickhou came to the United States in January 2002. Two months later, Nguesso's government arrested Gandziami-Mickhou's father as he was returning from a trip abroad, during which he met with Lissouba and Kolelas. Gandziami-Mickhou's father was killed shortly thereafter. In April 2002, Nguesso's men killed Gandziami-Mickhou's uncle. Gandziami-Mickhou's mother then began receiving death threats stating she would be next. Gandziami-Mickhou's family fled to southern Congo to hide in her father's village. Gandziami-Mickhou has not heard from them since they went into hiding. During this time, several of Gandziami-Mickhou's relatives' homes have been destroyed by Nguesso's regime.

Because Gandziami-Mickhou failed to return to college following the Spring 2002 semester, the INS issued a Notice to Appear, charging her as removable for failing to comply with the conditions of her visa. Gandziami-Mickhou filed her initial application for immigration relief in September 2002. Gandziami-Mickhou significantly amended her application in May 2003, adding allegations regarding the 2001 arrest and rape.

At a hearing before the IJ, Gandziami-Mickhou conceded removability, but she presented the foregoing evidence in support of her application for relief. Additionally, Gandziami-Mickhou introduced a number of documents in support of her application. Gandziami-Mickhou submitted an affidavit from her sister who has lived in France since 1999, stating that Gandziami-Mickhou and her father were active in the MCDDI and that their father and uncles were killed in 2002. Gandziami-Mickhou also submitted another affidavit from a childhood friend who had been granted asylum in the United States and was living in Missouri. The friend stated that Gandziami-Mickhou's father was an influential member of the MCDDI and that Gandziami-Mickhou was also very active in the organization. Letters from friends still living in Congo indicated that it was too dangerous to retrieve Gandziami-Mickhou's medical records and that Gandziami-Mickhou would risk assassination if she returned to Congo.

Gandziami-Mickhou also submitted affidavits from experts on African history and politics who verified that Gandziami-Mickhou's story is consistent with events that had happened in Congo. Further, Gandziami-Mickhou submitted an affidavit from a licensed professional counselor who diagnosed her as suffering from posttraumatic stress disorder (PTSD) and depression. The counselor verified that Gandziami-Mickhou's psychological presentation was consistent with someone who had experienced trauma and torture. Gandziami-Mickhou also submitted an affidavit from Dr. Jehan El-Bayoumi, who stated that a scar on Gandziami-Mickhou's buttocks was consistent with her description of being beaten with a belt buckle. Dr. El-Bayoumi also averred that Gandziami-Mickhou appeared to be suffering from PTSD and recommended she continue psychiatric treatment. Finally, Gandziami-Mickhou submitted a number of background doc-

uments describing the political turmoil and human rights abuses in Congo after Nguesso came into power.

On cross-examination, Gandziami-Mickhou stated that someone named Ralph Cukar helped her prepare her asylum application. According to Gandziami-Mickhou, she wrote her version in French, and Cukar translated it into English. Gandziami-Mickhou claimed that Cukar did not put down everything that she told him had happened in her initial application because he said it was not necessary. Gandziami-Mickhou testified that she did not know where Cukar was on the day of her hearing.

Gandziami-Mickhou also testified that she had no intention of applying for asylum when she arrived in the United States. Although on her way to the United States Gandziami-Mickhou had visited a sister in France who had received asylum, Gandziami-Mickhou did not think about applying for asylum until after her father was killed.

Additionally, Gandziami-Mickhou stated that Kolelas was touring in South Africa at the time of her hearing but that neither she nor her family had attempted to contact him regarding her asylum application. However, Gandziami-Mickhou later changed her story and testified that she had tried to contact Kolelas through a friend but was unable to do so.

Gandziami-Mickhou acknowledged that she did not make any attempt to get documents from the MCDDI. Although the MCDDI still operates in Congo, Gandziami-Mickhou stated that she no longer trusts it because its current president was appointed by Nguesso. In addition, although Gandziami-Mickhou received some documents from her friends in Congo, she testified that it was too difficult for them to obtain her hospital records or contact members of the MCDDI without raising suspicion.

In response to questions from the IJ, Gandziami-Mickhou testified that she had disguised herself when she returned to Congo from the Democratic Republic of Congo so she would not be recognized. Gandziami-Mickhou also stated that she did not bring her family with her to the United States because she originally intended to return to Congo after going to school for two years.

## B.

In an oral decision, the IJ denied Gandziami-Mickhou's application, concluding that "[b]ased on the totality of the evidence . . . [she] failed to meet her burden in establishing past persecution or that she has a well-founded fear of future persecution should she return to the Republic of Congo at the present time." J.A. 103-04. Among other reasons, the IJ noted that Gandziami-Mickhou failed to present evidence from the MCDDI to corroborate her claims that: (1) her father was a founding or active MCDDI member, or a significant financial MCDDI contributor; (2) her father was killed because of his association with MCDDI; (3) she was an active member of the MCDDI involved in their publicity activities; and (4) she was arrested in March 2001 at least in part for her MCDDI activities. The IJ further noted that Gandziami-Mickhou did not present a satisfactory explanation for her failure to obtain such corroboration. The IJ pointed to Gandziami-Mickhou's testimony that she did not try to obtain documentation and corroboration from the MCDDI and that she did not try to obtain an affidavit from Kolelas, who was her father's friend.[1]

The IJ stated that she was also "perplexed" by several facts. First, the IJ noted that despite the fact Gandziami-Mickhou came to the United States on a student visa, she did not attempt to secure visas for her spouse and children who allegedly had been in and out of hiding with her. The IJ reasoned that although Gandziami-Mickhou claimed unawareness of the existence of such visas, her alleged circumstances in Congo would have prompted her to inquire of embassy officials

---

[1]The IJ noted that according to the State Department country report for the Republic of Congo for the year 2002, the MCDDI was an operating political party in that country in 2002. Although according to the report most political parties were ineffective, opposition political parties were nonetheless able to campaign openly during the year. Thus, the IJ concluded that there was a source in Congo for Gandziami-Mickhou to at least attempt to obtain this information. Further the IJ pointed to Gandziami-Mickhou's testimony that she has friends in Congo who forwarded documents to her such as her marriage certificate and the birth certificates of her children. The IJ questioned why Gandziami-Mickhou made no effort to ask her friends to obtain documentation from the MCDDI.

about the possibility of bringing her family members with her to the United States. Second, the IJ questioned why Gandziami-Mickhou, en route to the United States, failed to apply for asylum while in France, where her sister had been granted asylum. Last, in light of the circumstances Gandziami-Mickhou testified about in Congo, the IJ questioned her testimony that when she came to the United States she was not intending to apply for asylum but rather simply wanted to go to school.

Additionally, the IJ noted that Gandziami-Mickhou had left Congo in 2001, passing through its immigration checkpoints with no apparent difficulties. The IJ found that Gandziami-Mickhou's testimony that she disguised herself when passing through Congo immigration checkpoints did not make sense because, according to her testimony, she had presented her passport for inspection to Congo officials, and her passport (which contains her *undisguised* photograph) bears an exit stamp from these officials to that effect.

Finally, the IJ found significance in the fact that Gandziami-Mickhou did not mention in her original asylum application her alleged arrest, detention, and sexual assault in March 2001. The IJ recognized that Gandziami-Mickhou stated that Cukar had prepared the application for her, but the IJ also noted that the signature block for the application preparer is blank and that she presented no corroboration that someone prepared the document for her.

In concluding this decision, the IJ expressly stated that she had "considered all of the documentation in rendering this decision," but found "that the documentation presented does not overcome [the] aforementioned concerns." J.A. 106-07. Gandziami-Mickhou appealed the IJ's denial of her application, but the BIA affirmed, stating that it agreed that Gandziami-Mickhou failed to carry her burden of proof and otherwise failed to establish any other grounds for relief.

### III.

Gandziami-Mickhou primarily claims that the IJ violated our decision in *Camara* by disregarding corroborating evidence that she submitted in her application for asylum and withholding of removal. In *Camara*, the IJ denied immigration relief based on an adverse credi-

bility finding, though she overlooked certain evidence that could have established an entitlement to relief. There, "quite apart from Camara's somewhat discredited testimony, [she] presented independent evidence, which the IJ did not discredit, demonstrating [she] suffered past persecution for her political beliefs." *Id.* at 370. Specifically, Camara presented a "Notice of Escape" documenting her escape from a military camp where she had been imprisoned. *Id.* Camara also offered evidence that she was imprisoned "on account of . . . political opinion" by presenting: (1) her membership in a political party, as shown by her membership card and a letter from the party's leader; (2) the reason given for her conviction on an arrest warrant and in a letter from the party's leader; and (3) State Department reports recording the brutal suppression of the political party, including the imprisonment of its members. *Id.* We noted that the "independent evidence, taken together, provided strong circumstantial evidence that Camara was imprisoned for political expression in opposition to the ruling government," and that the IJ erred by "completely ignor[ing]" this evidence. *Id.* at 370.

Gandziami-Mickhou argues that the IJ similarly ignored documentary evidence that she submitted to corroborate her testimony. Gandziami-Mickhou points to several articles and country reports describing Nguesso's brutal treatment of opposition parties. She also cites affidavits from her friends and family that confirmed her involvement in the MCDDI, the persecution she suffered, and her father's death because he was a MCDDI member. She notes that her birth certificate lists her father's occupation as an official for the ministry of youth and sports and contends this corroborated her claim that her father was a close friend of Lissouba and Kolelas. Finally, Gandziami-Mickhou cites the reports from her doctor and counselor indicating she is suffering from PTSD and has a scar that is consistent with her having been beaten with a belt buckle.

Contrary to Gandziami-Mickhou's argument, the IJ's decision was "[b]ased on the totality of the evidence." J.A. 103. Although the IJ did not discuss each item's individual worth, the IJ did not completely ignore these documents like the IJ in *Camara* did. 378 F.3d at 370-72. Instead, after "consider[ing] all of the documentary evidence in rendering [her] decision," the IJ concluded that these documents did not overcome her concerns about Gandziami-Mickhou's application. J.A.

106. In fact, the IJ identified particular pieces of missing, relevant documentation that would have assisted Gandziami-Mickhou in satisfying her burden of persuasion and explained why it was not unreasonable for her to attempt to obtain them.

Additionally, unlike in *Camara*, the documents that the IJ allegedly ignored do not constitute "*independent evidence*" that Gandziami-Mickhou suffered past persecution "*on account of . . .* political opinion." 378 F.3d at 370 (emphasis added). Whereas Camara provided a "Notice of Escape" from imprisonment, a membership card from her political party, a letter from the party's leader describing her arrest after participating in a political protest, an arrest warrant for "disturbing the public order," and State Department reports recording the persecution of members of that political party, the only documents that Gandziami-Mickhou alleges the IJ overlooked that specifically connect her to the persecution of the MCDDI are affidavits from friends and family — hardly the independent evidence that *Camara* contemplates. *Id.* Even accepting Nguesso's brutal treatment of political opposition, and assuming that Gandziami-Mickhou was in fact beaten in prison, she has failed to demonstrate that her imprisonment was "*on account of . . .* political opinion." Thus, even had the IJ "completely ignored" this evidence as Gandziami-Mickhou alleges, her claim fails because she has presented no "independent evidence, which the IJ did not discredit, demonstrating [she] suffered past persecution for her political beliefs." *Id.* Because the IJ's determination is not manifestly contrary to law and is supported by substantial evidence, we will not upset the agency's decision to deny Gandziami-Mickhou's application for asylum and withholding of removal.[2]

---

[2]Gandziami-Mickhou also argues that the IJ "applied the wrong legal standard and failed to conduct an independent analysis" in evaluating her claim for relief under the CAT. Because an alien must have "exhausted all administrative remedies" before we can review a final order of removal, 8 U.S.C. § 1252(d)(1), the alien must raise each argument to the BIA before we have jurisdiction to consider it, *Asika v. Ashcroft*, 362 F.3d 264, 267 n.3 (4th Cir. 2004). Although Gandziami-Mickhou does mention the CAT in her brief to the BIA, noticeably absent is any suggestion that the IJ applied the wrong legal standard or failed to conduct an independent analysis. Thus, because Gandziami-Mickhou did not raise this issue in her appeal to the BIA, we lack jurisdiction to consider it. *Id.*

IV.

For the foregoing reasons, we deny Gandziami-Mickhou's petition to review the BIA's decision to deny her application for asylum, withholding of removal, and protection under the CAT.[3]

*PETITION FOR REVIEW DENIED*

---

[3]Gandziami-Mickhou makes additional arguments that the IJ placed unreasonable demands on her to obtain evidence, that the IJ erroneously based her decision on speculation and conjecture, and that the IJ erroneously relied on a minor perceived inconsistency. We have considered these arguments and find them meritless.