**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GURPREET BHABRA SINGH,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent.*

No. 11-1609

On Petition for Review of an Order
of the Board of Immigration Appeals.

Argued: September 21, 2012

Decided: November 5, 2012

Before DUNCAN, AGEE, and DIAZ, Circuit Judges.

Petition denied by published opinion. Judge Duncan wrote the opinion, in which Judge Agee and Judge Diaz joined.

## COUNSEL

**ARGUED:** Garish Sarin, LAW OFFICES OF GARISH SARIN, Los Angeles, California, for Petitioner. Lindsay Corliss, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Tony West, Assistant Attorney General, Civil Division, William C.

Peachey, Assistant Director, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

DUNCAN, Circuit Judge:

Petitioner Gurpreet Bhabra Singh ("Singh") seeks judicial
review of an order of the Board of Immigration Appeals (the
"Board") denying his application for withholding of removal
under both the Immigration and Nationality Act (the "INA")
and under Article III of the Convention Against Torture (the
"CAT"). Singh contends that the Board denied him relief in
part based on an improper adverse credibility determination.
Singh also argues that the errors of an incompetent interpreter
during his immigration proceedings violated his right to due
process. For the reasons explained below, we find no error,
and therefore deny Singh's petition for review.

I.

A.

Singh, born in 1985 in the Punjab state of India, is a native
and citizen of that country, and a member of the Sikh religion.
He departed his native country at some point in October 2005,
traveling to Mexico on a student visa. In February 2006, he
entered the United States from Mexico. After being served
with a Notice to Appear by the Department of Homeland
Security on November 29, 2007, Singh applied for withhold-
ing of removal under the INA, 8 U.S.C. § 1231(b)(3), and
under the CAT, *see* 8 C.F.R. § 208.16(c).

In his application and during the immigration proceedings,
Singh explained the circumstances which led to his flight
from India. The following facts are drawn from those narra-

tives, and, unless otherwise noted, are undisputed by the government.

Singh's father, Surinder Singh ("Surinder"), is a wealthy and influential farmer in the Punjab state where he and his family live. Sunil Dutti ("Dutti"), a member of the then-ruling Nationalist Congress party and the mayor of the town where the Singhs lived, sought Surinder's political support. Surinder, however, had professed himself a supporter of the then-opposition Akali Dal Party.

Singh also claimed allegiance to the Akali Dal Party, which he described as primarily committed to the care of Sikh religious shrines and providing assistance to rural farmers. According to Singh, although Sikhs can and do join different political parties, the Akali Dal Party is widely considered the leading Sikh political party. Singh testified that his involvement with the Akali Dal Party consisted of accompanying his father on campaign and fundraising visits.[1]

On January 26, 2005, Singh was at home when three members of the Congress Party, including one known supporter of Dutti, accompanied by three police officers, arrived in search of Surinder. Singh answered the door, and the group then forced its way into the house. Singh informed them that his father was not at home, but that they could speak with him instead. According to Singh, members of the group then sought to persuade him to convince his family—in particular his father—to support the Congress party in part by offering various sorts of benefits. When this attempt at persuasion proved ineffective, the group resorted to more coercive tactics.

---

[1]Singh testified that he accompanied his father on visits where Surinder sought to convince people to "vote for our family." J.A. 110. The record does not indicate, however, whether Singh, Surinder, or any other member of the family was a candidate for political office.

After reminding Singh that the Congress Party was in power, the group threatened him by telling him they could do whatever they wanted to him. Singh responded that he would report any misconduct to higher authorities, and an argument ensued. At some point the group indicated that they had come to arrest Surinder. According to Singh, when he protested the police had no cause to arrest his father and demanded to see the arrest warrant, the police officers arrested him instead.

The police transported Singh to a nearby police station where they told Singh he would be held until his father came to pick him up. The police held Singh for two days. During that time, they slapped and hit him, and at night, they tied his arms behind his back and further abused him. The police also beat him with a police club that broke his arm and rendered him unconscious. Upon waking from this beating, Singh noted he had been burned with a cigarette.

On January 28, 2005, Surinder came to the police station to secure the release of his son. Surinder gave 100,000 Indian rupees to the police, and they released Singh. According to Singh, Surinder knew one of the police officers personally, and thus was able to secure Singh's release but avoid arrest himself.

In June 2005, the officers who had arrested Singh in January reappeared looking for him. This time, Surinder was at home while Singh was not. After the police left, Surinder advised his son to leave their home in the Punjab state. Singh then borrowed money from a friend and traveled to Delhi, where he lived with relatives. He stayed in Delhi from June until October 2005, at which point he obtained a student visa to travel to Mexico. Singh claimed that he could not remain in Delhi because the police were looking for him throughout the country, and he feared they would file a false case against him, or worse, "take [him] anywhere and . . . kill [him]." J.A. 138.

Upon arrival in Mexico at some point in October or November 2005, Singh was detained by immigration authorities until the first week of February 2006. Once released, Singh headed to the United States, crossing the border on February 20, 2006. After being served with a Notice to Appear in November 2007, Singh applied for withholding of removal under the INA and CAT in January 2008.

Singh also recounted an incident that occurred to his father in August 2007—after Singh had already arrived in the United States. While the police were detaining Singh in January 2005, Surinder had unsuccessfully sought the intervention of the Akali Dal Party. In reaction to that party's failure to assist, Surinder withdrew his support. According to Singh, the Akali Dal Party retaliated two years later, in August 2007, by coming to the Singh family house, beating Surinder, and breaking one of his legs.

Along with his application, Singh submitted two types of supporting documentation. First, Singh included a number of articles and reports attesting to human rights abuses in various parts of India, including by police in the Punjab state. The report most pertinent to Singh's claim is a 2007 British Home Office Operational Guidance Note on India which describes the relationship then existing between the Congress and Akali Dal Parties:

> The Akali Dal and the Congress Party are both legal political parties within India who campaign and participate in State and National elections. There is no evidence to suggest that members of one party fearing ill-treatment or persecution by individual members of the other party could not seek protection from the authorities or relocate internally to escape a local threat.

J.A. 173-74. Second, Singh submitted affidavits from his family members and close family friends, as well as hospital reports documenting the scope of his injuries.

One final fact warrants mention. At some point after January 2005 and before Singh's immigration hearing, the Akali Dal Party came to power in the state of Punjab. It appears the Akali Dal Party remains in power in the Punjab state as part of a ruling coalition.[2]

B.

After submitting his application for withholding of removal and protection under the CAT,[3] Singh appeared for a hearing before an Immigration Judge (the "IJ") on March 13, 2008. Because Singh's counsel had previously agreed to conduct the hearing in English, no interpreter was present. Shortly into that hearing, however, the IJ determined Singh's English was inadequate to comprehend fully what was transpiring. The IJ therefore continued the hearing to a later date, explaining to Singh that "it is very important that the Court hears your application and it's very important that I understand your story." J.A. 80.

When the hearing recommenced on November 14, 2008, a Punjabi interpreter was in the courtroom. The IJ explained to Singh the procedures for communicating through and with an interpreter, including the need to inform the interpreter if Singh did not understand. Singh confirmed that he understood the procedures, and agreed to follow them.

---

[2]*See, e.g.*, *Akali Dal-BJP Sweep Punjab Civic Polls*, The Times of India (Jun. 10, 2012, 9:55 PM), http://articles.timesofindia.indiatimes.com/2012-06-10/india/32155676_1_akali-dal-bjp-akali-dal-bjp-akali-bjp-alliance (last visited Oct. 10, 2012).

[3]Singh did not seek asylum because he had been in the United States for more than a year at the time of his application. *See* 8 U.S.C. § 1158(a)(2)(B) (alien cannot seek asylum "unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States"). Singh concedes that an asylum application is time-barred.

At one point early in the November hearing, Singh's counsel was questioning Singh about founding figures in the Sikh religion. The IJ asked Singh's counsel to have the names spelled for the record, and counsel suggested, given his inability to speak Punjabi, that the interpreter was in a better position to spell the names properly. The interpreter responded that her lack of familiarity with the Sikh religion rendered her unable to spell the names correctly: "I can understand Punjabi and speak Punjabi, but the way that the names are you can spell them differently." J.A. 108. The IJ then directed Singh's counsel to move on. Singh proceeded to testify concerning the merits of his claims.

On May 6, 2009, the IJ entered a written memorandum and order denying Singh's application for withholding of removal under both the INA and the CAT, and ordering Singh removed from the United States to India. Applying the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (the "REAL ID Act"), the IJ found Singh's testimony lacked credibility because it failed to offer a plausible explanation for why his father was able to secure his release from prison without being himself arrested and failed to provide a coherent explanation of Singh's own political views. The IJ also concluded that Singh had not provided adequate corroboration for his claims. Specifically, the IJ took issue with (1) Singh's explanation that his sister, who lives in the United States, could not testify or submit a statement on his behalf; (2) Singh's inability to demonstrate that a legal or administrative action against Punjabi police would necessarily have been ineffective, given articles he submitted suggesting otherwise; and (3) Singh's insufficient explanation of an altered affidavit submitted by one of Singh's family friends. On this last point, the IJ did not credit the affidavit because Singh had not explained why a date had been altered from 2005 to 2007.

Having made an adverse credibility determination, the IJ then concluded Singh failed to establish a clear probability of persecution on return to India on the basis of his political

opinion and thus was not entitled to withholding of removal under the INA. The IJ next concluded that because Singh had failed to demonstrate it was more likely than not he would be tortured upon return to India, Singh was also ineligible for withholding of removal under the CAT.

The Board affirmed the IJ's decision. In addition to upholding the IJ's denial of relief under the INA and the CAT, the Board rejected Singh's contention that the incompetence of the interpreter during his hearing before the IJ amounted to a violation of his right to due process. The Board based this latter conclusion on Singh's failure to raise any concern with the interpreter during the hearing and on the fact that "untranslated" portions of testimony had been left untranslated for legitimate reasons. Accordingly, the Board dismissed Singh's petition. This appeal followed.

## II.

Singh now presses three arguments on appeal. Singh first contends that the IJ's adverse credibility determination was unfounded, and that he does qualify for withholding of removal under the INA. Second, Singh asserts he is also entitled to withholding of removal under the CAT because his history of having been tortured by the police, when viewed in light of the human rights practices in the state of Punjab, demonstrates it is more likely than not he would be tortured if forced to return to India. Finally, Singh again argues that an incompetent interpreter providing inadequate translation violated his right to due process. We address each issue in turn.

## A.

To qualify for withholding of removal under the INA, an applicant must establish that if sent back to the country of removal, his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8

U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(1). An applicant for withholding must therefore show a "clear probability of persecution," and link that probability of persecution to one of the five grounds enumerated in the statute. *INS v. Stevic*, 467 U.S. 407, 413 (1984). The applicant bears the burden of establishing the credibility of the facts supporting his application, and, if so requested by the trier of fact, providing evidence that corroborates those facts. 8 U.S.C. § 1231(b)(3)(C) (referring to 8 U.S.C. § 1158(b)(1)(B)(ii) and (iii)). Thus, in reaching a decision on whether an applicant is entitled to withholding of removal under the INA, a trier of fact must determine the credibility of testimony and supporting documentation.

Singh first challenges the IJ's finding, upheld by the Board, that he does not warrant withholding of removal under the INA on the basis of his political opinion.[4] When, as here, the Board and an IJ issue decisions in a case, we review both on appeal. *Kourouma v. Holder*, 588 F.3d 234, 239-40 (4th Cir. 2009) (citation omitted). Those decisions should be upheld unless they are "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); *Zelaya v. Holder*, 668 F.3d 159, 165 (4th Cir. 2012). The agency's findings of fact are considered "conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) (citation omitted); 8 U.S.C. § 1252(b)(4)(B). "Agency findings with respect to an applicant's credibility are likewise entitled to judicial deference if such findings are supported by substantial evidence." *Dankam v. Gonzales*, 495 F.3d 113, 119 (4th Cir. 2007).

---

[4]Although Singh's brief refers to his religion and his membership in a particular social group that includes his family, Appellant's Br. at 32-33, Singh's only arguments for withholding of removal under the INA emphasize his political opinion or the political opinion allegedly imputed to him, *see id.* at 33-35.

In particular, Singh claims that the IJ and the Board misapplied the credibility provision in the REAL ID Act, and that such misapplication led to an erroneous decision to deny him relief under the INA. In response, the government argues that the record supports both the adverse credibility determination and the ultimate decision to deny Singh withholding of removal. Before addressing whether the record compels us to conclude that Singh is entitled to withholding of removal under the INA, we consider the effect of the REAL ID Act on credibility and corroboration requirements in the immigration context.

1.

Passed on May 11, 2005 and applicable to all asylum or withholding of removal applications filed under the INA after that date, the REAL ID Act amended the INA's provisions on credibility and corroboration. As to credibility determinations, the REAL ID Act provides:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, *without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim*, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility deter-

> mination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

REAL ID Act § 101(a)(3), codified at 8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added). Before the enactment of this provision, an inconsistency or other inaccuracy justified an adverse credibility finding only when that inconsistency went to the heart of an applicant's claim. *See Djadjou v. Holder*, 662 F.3d 265, 274 (4th Cir. 2011) ("Minor omissions, inconsistencies, and contradictions that do not go to the heart of the applicant's claims . . . do not necessarily support an adverse credibility determination."). As a number of our sister circuits have now recognized, the REAL ID Act's credibility provision effectively overrules the previous "heart of the claim" standard. *See Shrestha v. Holder*, 590 F.3d 1034, 1043 (9th Cir. 2010) ("Inconsistencies no longer need to 'go to the heart' of the petitioner's claim to form the basis of an adverse credibility determination."); *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009); *Wang v. Holder*, 569 F.3d 531, 537-38 (5th Cir. 2009) ("Congress's express rejection of the prior 'heart of the applicant's claim' standard demonstrates an intent to provide more discretion to the IJ in determining credibility of witnesses. . . ."); *Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008); *Lin v. Mukasey*, 521 F.3d 22, 26 (1st Cir. 2008); *Chen v. U.S. Attorney Gen.*, 463 F.3d 1228, 1233 (11th Cir. 2006); *Mitondo v. Mukasey*, 523 F.3d 784, 787-88 (7th Cir. 2006) ("This statute abrogates decisions that focus on 'whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim.'"). We now join those courts in recognizing the REAL ID Act's abrogation of our former standard for credibility assessments under the INA.[5]

---

[5]A number of our unpublished per curiam decisions have applied the REAL ID Act's credibility provision. *See, e.g., Abebe v. Holder*, 468 F. App'x 227, 228 (4th Cir. 2012); *Zong Ming Zhu v. Holder*, 462 F. App'x 319, 321 (4th Cir. 2012); *Yi Dong Lin v. Holder*, 444 F. App'x 652, 653

It is important to delineate what the REAL ID Act credibility provision changes and what it leaves in place. As the provision's language makes evident, an IJ's adverse credibility determination need no longer rest solely on those matters fundamental to an alien's claim for relief under the INA. Instead, the REAL ID Act's credibility provision "is intended to allow Immigration Judges to follow a 'commonsense' approach while 'taking into consideration the individual circumstances of the specific witness and/or applicant.'" *In re J-Y-C*, 24 I. & N. Dec. 260, 262 (BIA 2007) (quoting H.R. Rep. 109-72, at 167) (internal alterations omitted). This more flexible approach to credibility assessments, however, does not alter the underlying methodological requirement that an Immigration Judge provide "specific, cogent reason[s]" for making an adverse credibility determination in a given case. *See Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004) (quoting *Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989)); *see also Shrestha*, 590 F.3d at 1042 (noting the IJ's requirement to provide specific, cogent reasons for an adverse credibility determination "is not altered by the REAL ID Act").

In addition to altering the INA's credibility provision, the REAL ID Act also amended the INA's requirement for corroborating evidence. Under the amendment, when a trier of fact is not fully satisfied with the credibility of an applicant's testimony standing alone, the trier of fact may require the applicant to provide corroborating evidence "unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii);[6] *see also J-Y-C*,

---

(4th Cir. 2011); *Ngwa v. Holder*, 441 F. App'x 203, 204-05 (4th Cir. 2011); *Jie Jie Lin v. Holder*, 436 F. App'x 182, 184 (4th Cir. 2011); *Ling Yu v. Holder*, 433 F. App'x 174, 175 (4th Cir. 2011); *Lewete v. Holder*, 429 F. App'x 320, 321 (4th Cir. 2011); *Acharya v. Holder*, 424 F. App'x 196, 197 (4th Cir. 2011).

[6]Although the statute refers specifically to an asylum applicant, *see* 8 U.S.C. § 1158(b)(1)(B)(ii) (referring to whether applicant has demonstrated "specific facts sufficient to demonstrate that the applicant is a *refugee*") (emphasis added), a cross-reference at 8 U.S.C. § 1231(b)(3)(C) applies the REAL ID Act's credibility and corroboration provisions to an alien seeking withholding of removal under the INA.

24 I. & N. Dec. at 263 ("The amendments to the [REAL ID] Act continue to allow an alien to establish eligibility for asylum through credible testimony alone, but they also make clear that where a trier of fact requires corroboration, the applicant bears the burden to provide corroborative evidence, or a compelling explanation for its absence." (citation omitted)).[7] A failure to either provide corroborative evidence following a request by a trier of fact or explain its absence further buttresses an adverse credibility determination.

2.

Having reviewed the changes wrought by the REAL ID Act to the INA's credibility and corroboration provisions, we now assess the adverse credibility determination in this case in light of those amendments. After considering the totality of the circumstances and all relevant factors implicated in Singh's claim, the IJ identified three grounds for finding Singh's testimony incredible. First, Singh's testimony about his father coming to the police station to secure Singh's release lacked "inherent plausibility." 8 U.S.C. § 1158(b)(1)(B)(iii). In particular, the IJ found it implausible that an individual wanted for arrest and whose son was arrested in his stead would be able to appear at the police station—and then negotiate with the police regarding his son's detention before paying for his son's release—without being himself arrested. Although Singh offers a "mixed-motive" theory on appeal—that the police were simultaneously seeking to persecute Singh and his father for their support of the

---

[7]The REAL ID Act's amendment of the INA's corroboration requirement sought to "codify the [Board]'s corroboration standards." *J-Y-C-*, 24 I. & N. Dec. at 263 (citation and internal alteration omitted). Unlike the amendment to the credibility provision, however, this amendment effects no change to our existing precedent. *See Marynenka v. Holder*, 592 F.3d 594, 601 (4th Cir. 2010) ("[E]ven for credible testimony, corroboration may be required when it is reasonable to expect such proof and there is no reasonable explanation for its absence.") (quoting *Lin-Jian v. Gonzales*, 489 F.3d 182, 191-92 (4th Cir. 2007)).

Akali Dal Party *and* to extort money from them—he did not articulate this explanation before the IJ or the Board. The IJ was therefore entitled to find that Singh's testimony lacked credibility on the record before him.

Second, the IJ reasonably found Singh to be nonresponsive at various points in his testimony. On one occasion, for example, counsel for the government sought at least twice to question Singh regarding the political opinion he held and for which he feared persecution in the future. In response, Singh first suggested he held views distinct from those advocated by any political parties. When pressed further, Singh began discussing his father's views and efforts by political parties to take his father's land. As the IJ noted, neither answer was responsive.[8]

Finally, Singh's inability to state with any detail his political opinion provides a third ground for finding his testimony wanting in credibility. Singh made clear not only that his views differed from those espoused by the existing political parties in the state of Punjab, but also that he now does not support any party. While support of a party is no *sine qua non* for holding a political opinion, Singh failed to articulate any political views whatsoever. At best, he identified his views with those of his father, Surinder. But Singh provided no

---

[8]To the extent Singh might ascribe his nonresponsiveness in the face of questions about his political views to problems with the interpreter—an argument not specifically advanced in his brief or at oral argument—we note that the transcript for the relevant part of the immigration hearing contains no untranslated portions or "indiscernible" notations. *See* J.A. 142-43. Certainly an applicant's nonresponsiveness cannot support an adverse credibility determination when caused by an incompetent interpreter. *See Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000); *Amadou v. INS*, 226 F.3d 724, 728 (6th Cir. 2000). Such is not the case here, where after making "a sincere effort to understand [Singh's] testimony, and . . . provid[ing] him with numerous opportunities to elaborate and to clarify it," *Rusu v. INS*, 296 F.3d 316, 324 (4th Cir. 2002), the IJ carefully based his adverse credibility determination on those moments of nonresponsiveness attributable solely to Singh.

explanation of Surinder's current political opinion, if any. Thus, taken together, these findings—the inherent implausibility of Singh's account of his father's having secured Singh's release from prison, Singh's nonresponsiveness while testifying, and Singh's failure to identify a political view likely to subject him to persecution—constitute specific and cogent reasons warranting an adverse credibility determination under the REAL ID Act's amendments to the INA's credibility provision.[9]

Further bolstering the IJ's adverse credibility determination was Singh's failure to provide adequate corroborating evidence when so requested. The IJ's request for corroborating evidence was reasonable in light of his credibility concerns with Singh's testimony. *See* 8 U.S.C. § 1158(b)(1)(B)(ii) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible. . . ."). In response, however, Singh failed to adduce evidence to corroborate his testimony. Instead, Singh produced testimonials from family members and close family friends, which properly troubled the IJ. Noting our concern that affidavits submitted by family members and close friends lack the hallmarks of independent evidence, *see Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 358-59 (4th Cir. 2006) (holding that a "notice of escape" from a prison, a membership card for a political organization, an affidavit from a political party leader, and State Department reports describing persecution of members of a political group, unlike "affidavits from friends and family," constitute independent corroborating evidence of political persecution), the IJ viewed Singh's testimonials with considerable skepticism.[10] Such skepticism

_____

[9]Given that Singh's lack of credibility extends to his putative political opinion, the evidence here arguably satisfies our pre-REAL ID Act "heart of the claim" standard as well.

[10]Singh did submit one affidavit from an individual identifying himself as an active member of the Akali Dal Party. *See* J.A. 211-13. While

is justifiably heightened where, as here, one of the affidavits had been altered by hand with no explanation provided.

Singh exacerbated his credibility problems by failing to explain why he did not or could not reasonably obtain additional evidence to corroborate his testimony. The IJ noted the lack of evidence from Singh's relatives in Delhi, with whom he claimed to have resided from June 2005 until he traveled to Mexico in October 2005, and was particularly troubled by Singh's explanation for the absence of any corroborating evidence from his sister who lives in the United States.[11] Singh reported, without elaboration, that "his sister could not testify or provide a statement because she is no longer a part of the family and because he does not want to involve her in his problems." J.A. 340. Although we have faulted an Immigration Judge for expecting the corroborative testimony of an applicant's friend when that friend had suffered a brain concussion and had been advised to refrain from any activity

---

largely corroborating Singh's account, the affidavit also raises new credibility questions. The affiant claims he assisted Surinder in bribing the police to secure Singh's release, and that Surinder subsequently stopped supporting the Akali Dal Party to avoid any further confrontations with the police. This account differs from Singh's claim that his father's support of the Akali Dal Party ceased because the party failed to assist their family while Singh was detained.

[11] Although not required to credit fully affidavits from family members, *see Gandziami-Mickhou*, 445 F.3d at 358-59, in this case, the IJ nonetheless rightly expected Singh either to produce such evidence or explain why he could not reasonably obtain it, *see* 8 U.S.C. § 1158(b)(1)(B)(ii). Our holding in *Gandziami-Mickhou* neither requires an IJ to discredit any and all affidavits from close friends and family, *see, e.g., Tassi*, 660 F.3d at 722-23 (faulting IJ for not crediting affidavit of applicant's mother-in-law), nor does it permit an IJ to solicit such evidence only then to fault an applicant because the solicited evidence is not adequately independent. Here, the IJ provided specific, cogent reasons for seeking corroborating evidence from Singh's relatives in Delhi and his sister, and did not rely solely on the absence of this corroborating evidence to support his adverse credibility determination.

which might upset her,[12] *see Marynenka v. Holder*, 592 F.3d 594, 598-99 (4th Cir. 2010), the IJ's expectation of some form of corroboration from Singh's sister—or some explanation why such evidence could not reasonably be obtained—falls well within his discretion as the trier of fact under the REAL ID Act's corroboration provision. *See* § 1158(b)(1)(B)(ii).

In sum, the IJ provided specific and cogent reasons explaining his adverse credibility determination, and found further support for that determination in Singh's inability to sustain his burden to provide corroborating evidence of his statement and testimony. We conclude that substantial evidence in the record supports these reasons under the REAL ID Act's "totality of the circumstances" standard, and therefore uphold the IJ's and the Board's adverse credibility determination.[13]

---

[12]Because the friend would have had to testify about a gang rape she and the applicant suffered at the hands of the Belarusian police, there is little doubt such testimony would have upset her. *See Marynenka*, 592 F.3d at 598.

[13]Given the extent of Singh's credibility and corroboration problems here, we have no need to reach an issue that has understandably troubled our sister circuits, namely, how small an inconsistency is sufficient to justify an adverse credibility finding. *Compare Castaneda-Castillo v. Gonzales*, 488 F.3d 17, 23 n.6 (1st Cir. 2007) (en banc) (interpreting the REAL ID Act to revive the *falsus in uno, falsus in omnibus* approach to credibility determinations) *with Kadia v. Gonzales*, 501 F.3d 817, 822-23 (7th Cir. 2007) (Posner, J.) (dubious of this view because an IJ "cannot discredit otherwise persuasive testimony because of a misspelling in the asylum application"); *see also* Scott Rempell, *Credibility Assessments and the REAL ID Act's Amendments to Immigration Law*, 44 Tex. Int'l L.J. 185, 231 (2008) ("[O]n a sliding scale of inconsistencies between simple misspellings and inconsistencies reasonably indicative of untruthfulness are those that will require further resolution on the basis of their relation to the inference of untruthfulness as interpreted in accordance with the deferential standard of review and applicable burden of proof."). Interesting as this question is, however, Singh's credibility problems are not of so small a quantum as to warrant discussion of it in this case. *Cf. Lin*, 521 F.3d at 27 n.3 (flagging issue but not addressing it because "we cannot say it would be irrational to consider the inconsistencies in this case relevant to [the applicant]'s truthfulness").

3.

Having found substantial evidence supporting the Board's adverse credibility determination, we now consider whether, in light of that determination, Singh is nonetheless entitled to withholding of removal under the INA. To prevail on his withholding of removal claim, Singh must establish "a clear probability of persecution" on the basis of race, religion, nationality, political opinion, or membership in a particular social group. *Stevic*, 467 U.S. at 413. This standard imposes a more stringent burden than for asylum.[14] *Id.* at 429-30. Persecution takes the form of "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (citing *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985)) (overruled in part by *Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987)); *see also Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (explaining that persecution, which must "rise above the level of mere harassment," is "an extreme concept that does not include every sort of treatment that our society regards as offensive" (citations omitted)). Where an applicant establishes past persecution, he is entitled to a rebuttable presumption that his "life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1)(i).

At the outset, we observe that the adverse credibility determination deals a fatal blow to Singh's withholding of removal claim under the INA. Simply put, because Singh has failed to demonstrate that he holds a political opinion, let alone one that would serve as the basis for any future persecution if returned to India, he cannot establish a nexus to a statutorily protected ground. Moreover, his lack of credibility renders

---

[14]To qualify for asylum as a refugee, an applicant must demonstrate "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(42)(A).

unavailable a theory of relief under the INA based on past persecution. *See Djadjou*, 662 F.3d at 273-74 ("The existence of only a few . . . inconsistencies, omissions, or contradictions can be sufficient for the agency to make an adverse credibility determination as to the applicant's entire testimony regarding past persecution.")

Even had Singh been found credible, however, his claim for relief under the INA still falls short for two reasons. First, Singh's core claim of persecution stems from mistreatment at the hands of the Congress Party and those police officers supporting it. Before he fled from the state of Punjab to Delhi in June 2005, Singh identified himself as a supporter of the Akali Dal Party. Now, however, the Akali Dal Party is in power. Although Singh no longer supports the Akali Dal Party, there is no indication either that the Congress Party and its supporters are in a position to harass Singh further through collaboration with the police or that the Akali Dal Party would target Singh for persecution.

On appeal, Singh contends that his father's lack of support for the Akali Dal Party, which Singh contends led to an attack by the party on his father in August 2007, should be imputed to him. Appellant's Br. at 34-36. This contention suffers from a number of flaws. Nothing in the record indicates that members of the Akali Dal Party have imputed or would impute Surinder's lack of support for the party to Singh. Moreover, Singh has pointed to no other family member—which includes a younger brother living at home—to whom Surinder's political views have been imputed. Finally, even assuming attribution of Surinder's political opposition to the Akali Dal Party to Singh, Singh does not explain how the single violent act against his father in August 2007 presages persecution against Singh (or his father) in 2012 and beyond. Indeed, the record discloses no acts of violence or reprisals against Surinder since August 2007, and if he is able to reside in his home without suffering persecution at present, it is difficult to understand why Singh could not do so as well.

The second shortcoming in Singh's petition for relief under the INA is his failure to demonstrate that he could not relocate safely to some part of India outside the state of Punjab. An applicant for withholding must demonstrate either that his well-founded fear of persecution extends country-wide or that it would be unreasonable to expect him to seek refuge in another part of the country. *See Matter of R-*, 20 I. & N. Dec. 621, 626-27 (BIA 1992). Here, Singh moved to Delhi in June 2005, and apparently lived there without incident until October 2005, when he left for Mexico. Although Singh claimed police were looking for him all over India, no evidence in the record supported this claim, and the IJ did not credit it. Moreover, nothing in the record suggests it would be unreasonable for Singh to continue living in Delhi.[15] Thus, because substantial evidence supports Singh's failure to establish a clear probability of persecution throughout India, the Board's conclusion that he was not entitled to withholding of removal under the INA is not "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

## B.

We turn next to Singh's claim that he is entitled to withholding of removal under the CAT. To prevail on his CAT claim, Singh must demonstrate "it is more likely than not that he . . . would be tortured if removed" to India. 8 C.F.R. § 1208.16(c)(2). No nexus to a statutory ground—race, religion, nationality, political opinion, or membership in a particular social group—is required, and an adverse credibility finding with respect to a withholding claim under the INA is not itself sufficient to defeat a withholding claim under the CAT. *Camara*, 378 F.3d at 371. To constitute torture within the meaning of the CAT, the harm must be "inflicted by or at

---

[15]The 2007 British Home Office Operational Guidance Note on India Singh submitted with his application indicated that those fearing persecution on political grounds in the state of Punjab could "relocate internally to escape a local threat." J.A. 173-74.

the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Factors properly considered when determining whether an individual is more likely than not to face torture if returned to the country of removal are evidence of past torture, whether the individual could relocate to another part of the country where she is not likely to be tortured, evidence of human rights violations in the country of removal, and any other relevant country-specific information. 8 C.F.R. § 1208.16(c)(3).

Focusing on his CAT claim at oral argument, Singh contends that the IJ and Board erred by (1) ignoring the torture he suffered at the hands of the police; (2) failing to account for the objective evidence of widespread human rights abuses as described in the documentation he submitted; and (3) "allow[ing] the taint of the earlier adverse credibility determination to bleed through into their consideration" of Singh's CAT claim. Appellant Br. at 39. The government disagrees, contending the IJ and the Board undertook the proper analysis and had ample support in the record for denying Singh's petition for CAT relief. Because substantial evidence supports the conclusion that Singh is not more likely than not to face torture if removed to India, we conclude the IJ and the Board did not err in finding Singh ineligible for withholding of removal under CAT.

The IJ and the Board gave fair consideration to Singh's first two arguments, and based their rejection of those arguments on substantial evidence. Considering Singh's past mistreatment alongside objective documentation describing human rights practices throughout India, the IJ acknowledged that "significant abuses do occur," but ultimately concluded that "the mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured." J.A. 344. Singh never explains why this conclusion is flawed, and our review of the documentary evidence Singh

submitted reaches the same result.[16] Moreover, the IJ's find-ing—never disputed by Singh—that Singh could have relo-cated safely to another part of India to avoid torture further reinforces the conclusion below. *See* 8 C.F.R. § 1208.16(c)(3)(ii) (permitting consideration of "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured").

Singh's third argument—that the adverse credibility deter-mination with respect to his INA claim improperly infected the IJ's and Board's CAT analysis—ignores the careful dis-tinction made below. Although the Board observed that Singh "seeks to predicate his claim for both [relief under the INA and the CAT] on the same set of historical facts," it nonethe-less recognized that an adverse credibility determination under the INA cannot itself defeat a CAT claim. J.A. 402; *see also Camara*, 378 F.3d at 371. The Board then based its con-clusion that Singh was not likely to be tortured on a rationale akin to the IJ's theory that Singh could not establish an indi-vidualized risk of torture. The fact that Singh cannot articulate a basis for his past mistreatment is not fatal to his CAT claim, but it does present a challenge to a showing that he is more likely than not to be tortured in the future.[17]

### C.

We turn finally to Singh's claim that an incompetent inter-preter violated his Constitutional right to due process. We review due process claims alleging procedural failings in the

---

[16]The country reports in the record identify widespread corruption throughout India, including in the state of Punjab, but do not present evi-dence tending to show Singh would more likely than not be tortured.

[17]We note the Board ultimately found that Singh had failed to show a "clear probability" of torture. J.A. 402. To the extent this standard is higher than the "more likely than not" standard used in the regulations, the Board erred. Singh does not, however, make this argument. Nonetheless, we conclude that the error is harmless, as Singh cannot satisfy the "more likely than not" standard.

immigration context de novo. *Rusu* 296 F.3d at 320. To pre-
vail on this claim, Singh must establish a violation and show
prejudice. *Id.* at 320-21. To establish a violation, he must
show he was not "accorded an opportunity to be heard at a
meaningful time and in a meaningful manner," meaning he
did not "receive a full and fair hearing on [his] claims." *Id.* at
321-22. "And we may only find prejudice 'when the rights of
an alien have been transgressed in such a way as is likely to
impact the results of the proceedings.'" *Id.* at 320-21 (citing
*Jacinto v. INS*, 208 F.3d 725, 728 (9th Cir. 2000) (internal
alterations omitted)). We conclude that Singh's claim fails
because he cannot establish either a violation or prejudice.

The core argument in Singh's opening brief in support of
his due process claim—that the interpreter stated in open
court that she could not speak Punjabi—is either an attempt
to deceive the court or an egregious error.[18] The transcript
makes clear that Singh's counsel—and not the interpret-
er—stated he could not speak Punjabi. By contrast, the inter-
preter stated she could both understand and speak Punjabi.
More broadly, we observe that the IJ took specific steps to
make sure an interpreter was provided, and that Singh under-
stood the interpreter. *See* J.A. 75-76 (IJ identifying language
problem during initial removal hearing); *id.* at 80 (IJ telling
Singh that although Singh understood and could speak some

---

[18]Although Singh did not admit the error at oral argument, he did not
press this point. He did, however, both in his reply brief and through coun-
sel at oral argument raise another troubling attack on the interpreter,
namely, that she let questions of religion interfere with her ability to inter-
pret competently. *See* Appellant's Reply Br. at 2. This argument ignores
the context in which the question of religion arose. When Singh's own
counsel was questioning him regarding the founders of the Sikh religion,
the IJ asked the counsel to spell the names of the figures Singh had named.
When Singh's counsel sought to defer to the interpreter's ability to spell
the names in English, the interpreter, by way of explaining her inability
to spell names of figures with which she was unfamiliar, noted that she
was not an adherent of the Sikh religion. Viewed in this context, the inter-
preter's discussion of religion raises no concerns.

English, "it is very important that the Court hears your application and it's very important that I understand your story"); *id.* at 97 (IJ noting use of simultaneous interpreter at continued removal proceeding); *id.* at 105-06 (IJ informing Singh of procedures for communicating with and through interpreter).

Although Singh identifies some areas where he believes the interpretation was inadequate, nothing in the record suggests such errors (if they occurred) denied Singh a full and fair hearing. As the Board noted, many of the untranslated portions of the transcript appear to have been left untranslated for legitimate reasons, including that Singh had started answering a question before the interpreter had completed her interpretation. Singh's brief exhaustively catalogues the various points where "indiscernible" appears in the transcript, but never explains—nor is it apparent—why these occasional ellipses taint the entire proceeding with unfairness. Further vitiating Singh's argument that the proceeding was not full and fair is the fact Singh appears to have more than a basic grasp of English.

Even assuming there were times the interpreter's work was less than perfect, and that such imperfection violates Singh's right to a full and fair hearing, Singh still cannot establish that he was prejudiced by such a violation. As the government notes, Singh "fails to identify a single instance in which the omitted words changed or obscured the general meaning of his testimony." Appellee's Br. at 35. In his reply brief, Singh makes the broad claim that "an incorrect or incomplete translation is the functional equivalent of no translation." Reply Br. at 1.[19] He also criticizes the absence of a bilingual

---

[19]This pithy formulation comes from *Perez-Lastor*, 208 F.3d at 778. That court identified three types of evidence which tend to prove a translation was incompetent: (1) direct evidence of incorrectly translated words; (2) unresponsive answers by the witness, which provide circumstantial evidence of translation problems; and (3) a witness's expression of difficulty understanding what is said. *Id.* at 778. At most, Singh can point to his unresponsive answers—which may or may not have anything to do with the interpreter.

transcript.[20] *Id.* at 2-3. But Singh still fails to explain in what way the supposedly inadequate work of the interpreter transgressed his rights "in such a way as is likely to impact the results of the proceedings." *Rusu*, 296 F.3d at 320-21. It is on this obstacle Singh's due process claim ultimately founders.

## III.

For the foregoing reasons, Singh's petition for review is

*DENIED*.

---

[20]At oral argument, the government asserted that Singh had failed to exhaust this issue before the Board below. We need not determine, however, whether Singh properly raised the quality of the transcripts below because we conclude he cannot demonstrate prejudice in any event.