**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1403**

LARISSA BRIGITTE CARMELLE MBALLA BOUBA NEE JOSEPH,

        Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 20, 2018                             Decided: July 24, 2018

Before GREGORY, Chief Judge, and WILKINSON and AGEE, Circuit Judges.

Petition denied by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Agee joined. Chief Judge Gregory wrote a dissenting opinion.

**ARGUED:** John Franklin Hester, Jr., MCCOPPIN & ASSOCIATES, P.A., Cary, North Carolina, for Petitioner. Christina Petersen Greer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Richard Andrew McCoppin, MCCOPPIN & ASSOCIATES, P.A., Cary, North Carolina, for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Terri J. Scadron, Assistant Director, Corey L. Farrell, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Larissa Brigitte Carmelle Mballa Bouba née Joseph, an Apostolic Christian of Haitian parentage from the Central African Republic, sought asylum, withholding of removal, and protection under the Convention Against Torture based on her fear of ethnic and religious persecution in her home country. An immigration judge found her testimony credible, but concluded that corroborating evidence was necessary to grant her requests and ordered her removed. The Board of Immigration Appeals dismissed Mballa Bouba's appeal. We deny her petition for review.

I.

Mballa Bouba is a native and citizen of the Central African Republic. Because her parents were from Haiti, Mballa Bouba's appearance is unlike other Central Africans. Her husband is also a member of a minority ethnic group. Both Mballa Bouba and her husband are Apostolic Christians.

Roughly 80% of Central Africans are Christians, but only 10% are Apostolic. Between 10% and 15% of Central Africans are Muslims. Séléka is a predominantly Muslim militia group that has killed Christians in the Central African Republic. Although now formally disbanded, Séléka participated in a civil war that lasted from 2012 to 2014. Some of its members remain active, mostly in northern and eastern areas of the country.

In March 2013, Mballa Bouba says Séléka fighters entered her neighborhood to attack local men, causing her husband to flee. In November, Mballa Bouba says two armed, uniformed men shouted at her to stop praying. She believed they were members of Séléka and interpreted their words as a threat. She was not harmed, but immediately

2

called her husband to discuss the incident. About one week later, French forces expelled Séléka fighters from the area. Mballa Bouba and her family then fled to Cameroon, where they registered as refugees and settled in a refugee camp.

In January 2014, Mballa Bouba's father died in North Carolina. She obtained a visitor visa to attend his funeral, and entered the United States on February 7. She remained here after the visa expired on August 6. Mballa Bouba's husband and four of her children continued to live in a refugee camp in Cameroon, where she spoke to them regularly by phone.

On August 18, Mballa Bouba applied for asylum, withholding of removal, and protection under the Convention Against Torture. Her application expressed concern that she would be killed by Séléka members were she to return to the Central African Republic. She received an asylum interview the following month.

A year after she filed for asylum, the Department of Homeland Security initiated removal proceedings against Mballa Bouba for overstaying her visa. She appeared before an Immigration Judge on June 1, 2016, and argued she was eligible for asylum on the protected grounds of race, nationality, religion, and particular social group. Mballa Bouba explained that she is "not ethnically alike to any group in Africa"; that "she is perceived as foreign by the local populace" because her parents were Haitian; that she is an Apostolic Christian; and that she is a member of a particular social group in the Central African Republic because she is a "Christian woman of non-CAR descent" and "married to a CAR northerner." A.R. 323, 327.

3

The IJ denied Mballa Bouba's requests and ordered her removed. Although he found her testimony credible, he noted that Mballa Bouba "produced no evidence regarding why the Séléka sought to harm her or that [the uniformed men] were in fact Muslim Séléka rebels," and therefore "deem[ed] corroborating evidence necessary." A.R. 59-60. Given that Mballa Bouba's husband experienced two of the alleged incidents supporting Mballa Bouba's application and knew about the third, the IJ said it was "reasonable to expect [Mballa Bouba] to obtain an affidavit from" him. A.R. 61. The IJ also determined that Mballa Bouba did not establish past persecution or a sufficient likelihood of future persecution. He noted that the majority of Central Africans are Christian, and that religiously motivated violence has been contained to certain parts of the country.

Mballa Bouba appealed to the Board of Immigration Appeals. The BIA adopted the IJ's reasoning. It concluded that Mballa Bouba "did not sufficiently corroborate her claim because she failed to submit evidence from her husband who was privy to the events in question," as well as that "the harm experienced by [Mballa Bouba] did not rise to the level of persecution, and that she failed to show she could not reasonably relocate to avoid future harm." A.R. 4.

This petition for review followed. Where the BIA has adopted the reasoning of an IJ, we review both opinions. *See Singh v. Holder*, 699 F.3d 321, 327 (4th Cir. 2012). We disturb only those legal conclusions that are "manifestly contrary to the law and an abuse of discretion," and must consider underlying factual findings "conclusive unless any

4

reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4).

## II.

We first consider whether requiring Mballa Bouba to produce corroborating evidence from her husband was "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4).

Under the Immigration and Nationality Act, the Attorney General has discretion to grant asylum to a noncitizen who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Under the REAL ID Act, "when a trier of fact is not fully satisfied with the credibility of an applicant's testimony standing alone, the trier of fact may require the applicant to provide corroborating evidence 'unless the applicant does not have the evidence and cannot reasonably obtain the evidence.'" *Singh*, 699 F.3d at 329 (citing 8 U.S.C. § 1158(b)(1)(B)(ii)).

Withholding of removal is mandatory where an applicant establishes that "it is more likely than not that [he] would be subject to persecution" on account of a protected characteristic. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Protection under the Convention Against Torture requires a showing "that it is more likely than not that [the applicant] will be tortured if removed to the proposed country of removal and, second, that this torture will occur at the hands of government or with the consent or acquiescence of government." *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012)

5

(citing 8 C.F.R. § 1208.16(c)(2)). Because the "more likely than not" standards for withholding of removal and the Convention Against Torture impose a higher barrier to relief, an applicant who has failed to meet the well-founded fear standard for asylum is not entitled to the other protections. *See Anim v. Mukasey*, 535 F.3d 243, 252-53 (4th Cir. 2008).

The IJ's decision to require corroborating evidence from Mballa Bouba's husband was not an abuse of discretion.[1] An applicant for asylum bears the burden of establishing eligibility, and "even for credible testimony, corroboration may be required when it is reasonable to expect such proof and there is no reasonable explanation for its absence." *Lin-Jian v. Gonzales*, 489 F.3d 182, 191-92 (4th Cir. 2007). Mballa Bouba testified that her husband witnessed two of the incidents serving as the basis for her application, and she spoke to him about a third incident soon after it occurred. He was therefore a reasonable source of corroboration for her claims. Mballa Bouba, however, "did not

---

[1] Petitioner continues to bear the burden of establishing eligibility for asylum and the question, on which we owe the trier of fact substantial deference, is whether that burden has been satisfied.

In this regard, the dissent mentions prior cases that found affidavits from family members *insufficient* as a form of evidence. Diss. Op. at 17 ("[I]nsistence on a letter from her husband is at odds with our established precedent, which has repeatedly questioned the value of family member affidavits."). Each of the cases cited by the dissent involve an agency's refusal to credit these affidavits, not the use of such material to support testimony that was already credited. In fact, this argument cuts against the dissent's position, since it suggests the IJ was willing to accept lesser forms of corroboration than may be common.

submit an affidavit or any other form of statement" from her husband, "nor did she explain that [he was] unable to provide such a statement." A.R. 61.

On appeal, Mballa Bouba argues that she could not "reasonably obtain" a written affidavit from her husband because he lives in a refugee camp in Cameroon. But because she had testified that she regularly spoke to her family by phone, the IJ concluded that it would not be unreasonably difficult for her to ask him to write a letter in support of her application. There is no evidence in the record to suggest that Mballa Bouba's husband did not have access to supplies or mail service in the refugee camp. To the contrary, Mballa Bouba submitted her visa application while living in Cameroon.

In sum, we cannot say that the IJ and the BIA's determinations were "manifestly contrary to the law and an abuse of discretion." The request for corroborating evidence is therefore not grounds for granting the petition.

III.

We next consider whether "any reasonable adjudicator would be compelled to conclude" that Mballa Bouba established past persecution or a well-founded fear of future persecution. 8 U.S.C. § 1252(b)(4).

The INA does not define persecution. However, our precedents establish that "[p]ersecution involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of" a statutorily protected characteristic. *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005). Persecution does not include all threats, but only those "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom" itself. *Singh*, 699 F.3d at 332.

Mballa Bouba argues that the record compels the conclusion that she suffered past persecution. She describes experiencing a "day of dread" when her husband hid from Séléka fighters, a "nonverbal death threat" from uniformed men who yelled at her to stop praying, and fleeing from her neighborhood to escape religiously motivated violence. Opening Br. of Petr. at 13. While we do not make light of these events, a reasonable adjudicator could conclude that they did not amount to persecution. Mballa Bouba and her family were not confined, injured, or tortured. She was "unable to clearly articulate how she identified these specific [uniformed] men as Muslims," nor did she provide any evidence beyond her own assumption that they actually threatened her safety or life. A.R. 63. Without more, a bare request to stop praying does not compel the conclusion that Mballa Bouba was persecuted within the meaning of the INA.[2]

Where an applicant for asylum has not proved past persecution, she must establish a subjectively genuine and objectively reasonable fear of future persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987).[3] An applicant must also show that it

---

[2] The dissent urges us to adopt the view of some of our sister circuits that "having to practice religion underground to avoid punishment is itself a form of persecution." Diss. Op. at 22. Adopting such a position, however, would still require us to rely on Mballa Bouba's specific religious practices, which the IJ found to be uncorroborated. A.R. 64 ("The Court finds that [the] evidence is insufficient to corroborate Respondent's involvement in the Apostolic Christian denomination.").

[3] The dissent argues that the IJ applied the wrong legal standard, which requires a reasonable probability of persecution, and instead improperly required the petitioner to show that persecution was "more likely than not." Diss. Op. at 24 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987)). As the IJ explained, however, a well-grounded fear of persecution requires "a reasonable probability [of] being singled out individually for persecution or that there is a pattern or practice of persecuting similarly (Continued)

8

would be unreasonable to relocate within her country to avoid harm. *See* 8 C.F.R. § 1208.13(b)(2)(ii).

Substantial evidence supports the IJ and BIA's determination that Mballa Bouba did not establish a sufficient likelihood of future persecution, and that she could reasonably relocate to avoid harm. The Central African Republic's civil war has ended. Although religious tensions persist, "violence between Christians and Muslims mainly occurs in the Northeastern part of the country." A.R. 65. Central Africans who fled are returning. The country's population is still overwhelmingly Christian. One of Mballa Bouba's daughters remains in the Central African Republic, and the record does not suggest she has suffered persecution on account of her Christianity.

Mballa Bouba contends that Séléka could reemerge to gain power or that an influx of foreign fighters could shift the balance of power in her country. At bottom, these arguments are too speculative to serve as a basis for rejecting the factual findings of the IJ and BIA. Because a reasonable adjudicator could conclude that Mballa Bouba has not established a well-founded fear of future persecution in the Central African Republic, the petition for review is

*DENIED*.

---

situated individuals." A.R. 66. The dissent selects quotes from later in the opinion to suggest otherwise, but the IJ clearly stated and applied the proper legal rule.

9

GREGORY, Chief Judge, dissenting:

Larissa Brigitte Carmelle Mballa Bouba (née Joseph) sought refuge in the United States from the violent sectarian conflict that has overrun her home in the Central African Republic (CAR). Despite finding her credible, an Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) denied her asylum claim because she did not produce an affidavit from her husband, who lives in a refugee camp in Cameroon. And despite uncontroverted evidence showing that she suffered persecution on behalf of her religious practice, both the IJ and the BIA found that she had not stated a claim for asylum. Because the majority affirms these erroneous conclusions, I respectfully dissent.

## I.

The majority's brief background summary neglects several key facts that, properly addressed, reveal the merit of Mballa Bouba's asylum claim. Because both the IJ and the BIA found Mballa Bouba to be credible, and because neither the Government nor the majority have presented any reason to doubt her credibility, we must presume that everything Mballa Bouba testified to is true. 8 U.S.C. § 1158(b)(1)(B)(iii).

### A.

In November 2012, the Séléka—a loose coalition of primarily Muslim armed groups, bolstered by Chadian and Sundanese mercenaries, A.R. 500—began taking over the north and center of CAR. A.R. 141, 223, 255, 500, 526, 552. In March 2013, the Séléka overran the capital and staged a coup. A.R. 255. Séléka leader Michel Djotodia installed himself as President, suspended the constitution, and dissolved parliament. *Id.*

10

Djotodia officially disbanded the Séléka in September 2013, but the "formal dismantling of the Seleka had no meaningful impact on their activities." A.R. 526. Instead, "[d]issolution of the Seleka was only symbolic," allowing Djotodia to "distance himself from the crimes committed by combatants over whom he had lost control." A.R. 552 & n.3.

During Djotodia's ten-month reign, "the Seleka were responsible for massacres, extrajudicial executions, rape, torture, and looting, as well as massive burning and destruction of villages." A.R. 526. According to Amnesty International, "the Christian community bore the brunt of the Séléka's oppressive rule." *Id.*; *see* A.R. 500 ("[B]y the time the Séléka came to power, many Christians noticed that they were being targeted while Muslims were being spared."). Even after official disbandment, the Séléka "continued to carry out vicious attacks on Christian civilians and their property at every opportunity," while armed members of the Muslim community "carried out brutal and large scale sectarian attacks on Christian civilians." A.R. 538–43. For example, in early December 2013, the Séléka attacked the Christian population in the capital Bangui, killing some 1,000 people. A.R. 527. Tens of thousands of Christians relocated to Bangui's international airport after being driven out of their homes. A.R. 506–07. A month later, dozens of Christian civilians were killed in small towns in northwest CAR. A.R. 538–43.

In retaliation and in defense, the "mostly Christian anti-balaka militias began carrying out armed operations" against Muslim civilians and the Séléka. A.R. 292, 526. According to Amnesty International, the violence against Muslims has risen to the level

11

of ethnic cleansing. A.R. 524. By April 2014, Muslims were almost completely expelled from Bangui. A.R. 501.

After state authority collapsed under his rule, Djotodia stepped down in early 2014 and was replaced by an interim president. A.R. 141, 527. The Séléka and the Anti-Balaka signed a ceasefire in mid-2014, but the violence did not end and both sides have violated its terms. A.R. 223, 288. Clashes between the Séléka and the Anti-Balaka, and between the Christian and Muslim communities, continued—including a resurgence of killings in Bangui in late 2015. A.R. 142, 151, 266–86. According to the U.S. State Department, the killings are "often reprisal in nature." A.R. 143; *see also* A.R. 244 (discussing reprisal attacks in March 2016). As a result, CAR is functionally divided into two: "The Séléka rebel movement, together with the local Muslim population (consisting of mainly Chadian and Sudanese migrant descent and Fulani Mbororo herdsman) continue to dominate the north and east of the country, while the anti-Balaka holds sway in the south and west." A.R. 288. As of May 2016, "around six thousand people ha[d] been killed and a quarter of the population ha[d] been displaced, with more than four hundred thousand refugees and three hundred thousand internally displaced persons." A.R. 223.

## B.

Mballa Bouba is a native CAR citizen of Haitian origin. A.R. 354. She is married to Constant Mballa Bouba, a CAR native and citizen from the northern part of the country. A.R. 129, 355. Mballa Bouba and her husband have five children, and she also has one daughter from a prior relationship. A.R. 355. Mballa Bouba's marriage license

12

and passport lists her and her husband's professions as "missionaries."  A.R.  370, 413–15.

Mballa Bouba is an Apostolic Christian; religion and prayer are a major part of her life.  A.R. 355.  In her most recent home in the Lakaouanga neighborhood of the capital Bangui, she had a detached prayer room where she and her family "would pray quite frequently and boisterously during the week."  *Id.*  Sometimes she and her family would pray all day or all night, and there were "times that any passer-by could hear [them] chanting and drumming."  *Id.*  Mballa Bouba would invite other people to come pray at her home; when asked if she invited close friends, she testified that "since it was the prayer that was unifying us, we were close as children of God."  A.R. 119.

In 2013, Mballa Bouba had three encounters with the Séléka, the last of which caused her and her family to flee CAR and seek refugee protection in Cameroon.

First, in March 2013, the Séléka went after the men in her neighborhood.  A.R. 57, 355–56.  She heard people shouting and watched people run for their lives.  A.R. 355.  Her husband fled to his mother's house, but returned a day later.  A.R. 57, 355–56.

Second, in November 2013, two armed Muslim Séléka soldiers wearing green uniforms came to her house and threatened her.  A.R. 57, 356.  Contrary to the majority's contention, *ante* 7, Mballa Bouba identified them as Muslim and Séléka because they had a mark on their faces worn by Muslims and because no one else was harassing Christians other than the Séléka.  A.R. 57, 108–15, 356.  The men pushed their way through the front gate of Mballa Bouba's home, told her they knew she was praying, and told her to stop.  A.R. 57, 108–15, 356.  If she didn't stop praying, they warned, they would come

13

back. A.R. 108–15. Mballa Bouba understood the order as a death threat because the men were armed and had a reputation for murdering Christians. A.R. 57, 108–15, 356. In response to the threat, Mballa Bouba and her husband changed their behavior to avoid future harassment: they "prayed together quietly indoors" and "tried to live carefully." A.R. 356.

Third, about a week later, Mballa Bouba's neighborhood was caught up in a battle between the Séléka and French Special Forces. A.R. 57, 116–17, 356. When the French forces pushed the Séléka out, Mballa Bouba and her family fled. A.R. 57, 356–57. They arrived in Cameroon on November 14, 2013, and promptly registered as refugees with United Nations High Commissioner for Refugees. A.R. 57, 356–57, 389–94.

As of Mballa Bouba's asylum hearing in June 2016, her husband and five of her children are still refugees in Cameroon; they live in a tent and communicate with Mballa Bouba by telephone only. A.R. 98–99. They do not have the right to remain indefinitely or gain legal status in Cameroon and are afraid of being killed by the Séléka if they return to CAR. A.R. 119–20, 349, 357. Mballa Bouba also regularly communicates by telephone with her daughter from her prior relationship, who remained in CAR. A.R. 98.

C.

On February 7, 2014, Mballa Bouba entered the United States on a six-month visitor visa to attend the funeral of her father, Wesner Joseph. A.R. 357. Six months later, after preparing herself "spiritually and emotionally," Mballa Bouba filed for asylum. A.R. 343–53, 357, 589. Prior to her hearing before the IJ, Mballa Bouba (through counsel) submitted extensive documentary evidence about country conditions in

14

CAR from 2012 to the first half of 2016, as well as a personal declaration and identifying documents.

At the hearing, Mballa Bouba supplemented these materials with sworn testimony. During the cross-examination, the Government attorney twice asked Mballa Bouba if her husband had provided a letter in support of her application; Mballa Bouba responded, "No." A.R. 101, 115. Neither the Government nor the IJ followed up to ask why she had not provided a letter or whether she had tried to obtain one. A.R. 101, 115.

Despite her testimony and the evidentiary record, the IJ issued a written decision denying Mballa Bouba asylum and withholding of removal. In a brief, single-member, unpublished opinion that incorporated by reference the reasoning of the IJ, the BIA dismissed her appeal.

## II.

Although we give BIA decisions substantial deference, our role is not to rubber-stamp every agency determination. We must reverse a BIA decision if it is "manifestly contrary to the law and an abuse of discretion." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 246 (4th Cir. 2017) (quoting *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011)); *accord* 8 U.S.C. § 1252(b)(4)(D). "The BIA abuses its discretion when it does not 'offer a reasoned explanation for its decision, or if it distorts or disregards important aspects of the applicant's claim.'" *Id.* (quoting *Tassi*, 660 F.3d at 719) (alterations omitted). Ultimately, "it is 'our responsibility to ensure that unrebutted, legally significant evidence

15

is not arbitrarily ignored by the factfinder." *Cordova v. Holder*, 759 F.3d 332, 340 (4th Cir. 2014) (quoting *Tassi*, 660 F.3d at 719).

The BIA and IJ abused their discretion in three respects. First, they concluded that Mballa Bouba should have provided a corroborating affidavit from her husband—even though both found her credible and even though her husband was living in a refugee camp in Cameroon. Second, they determined that Mballa Bouba had not suffered past persecution—even though key uncontested facts in the record show how Mballa Bouba changed her religious practice based on the Séléka's threat of violence. And third, they determined that Mballa Bouba did not have an objectively reasonable fear of future persecution because CAR is majority-Christian and she could relocate—even though the country has been divided by brutal sectarian conflict, leading to the collapse of state authority, persistent flare-ups between sectarian militias, and reprisal attacks that victimize civilians. I address each error in turn.

## A.

I turn first to the issue of corroboration. Although the applicant bears the burden of establishing eligibility for asylum, 8 U.S.C. § 1158(b)(1)(B)(i), an "individual can, without corroboration, satisfy this standard simply by presenting credible testimony about specific facts that would cause a similarly situated person to likewise fear persecution," *Jian Tao Lin v. Holder*, 611 F.3d 228, 236 (4th Cir. 2010) (citing 8 C.F.R. § 208.13(a)); *accord* 8 U.S.C. § 1158(b)(1)(B)(ii). The IJ found Mballa Bouba to be credible, crediting her testimony as "plausible, internally consistent, and consistent with the documentary evidence in the record." A.R. 59. The BIA agreed. A.R. 4. Therefore, Mballa Bouba's

16

testimony alone, assuming it addressed each element of her asylum claim, is legally sufficient to carry her burden.

Despite finding her credible, both the IJ and the BIA deemed corroborating evidence necessary for Mballa Bouba to "meet her burden of proof to establish eligibility for asylum," and both faulted her for "fail[ing] to submit evidence from her husband who was privy to the events in question." A.R. 4. The IJ and BIA can require corroborating evidence even from credible applicants—but only "when it is reasonable to expect such proof and there is no reasonable explanation for its absence." *Marynenka v. Holder*, 592 F.3d 594, 601 (4th Cir. 2010) (quoting *Lin-Jian v. Gonzales*, 489 F.3d 182, 191–92 (4th Cir. 2007)).

Neither the IJ nor the BIA "offer[ed] a reasoned explanation" for requiring a letter from Mballa Bouba's husband to corroborate her credible testimony. *Zavaleta-Policiano*, 873 F.3d at 246 (quoting *Tassi*, 660 F.3d at 719). Indeed, the Government's and the majority's insistence on a letter from her husband is at odds with our established precedent, which has repeatedly questioned the value of family member affidavits. In *Singh v. Holder*, for example, we found that the IJ was justifiably skeptical of family member affidavits because they "lack the hallmarks of independent evidence." 699 F.3d 321, 331 (4th Cir. 2012). In *Djadjou v. Holder*, we affirmed the agency's refusal to credit family member affidavits and letters because they "are not objective evidence." 662 F.3d 265, 276 (4th Cir. 2011). And in *Gandziami-Mickhou v. Gonzales*, we dismissed affidavits from friends and family as not constituting "independent evidence." 445 F.3d 351, 359 (4th Cir. 2006). Neither the Government nor the majority has

17

presented any reason to think that the IJ or BIA would have credited an affidavit from Mballa Bouba's husband had she provided one.

Moreover, a reasonable factfinder would be compelled to conclude that an affidavit from Mballa Bouba's husband is unavailable. 8 U.S.C. § 1252(b)(4) (stating that the courts of appeals can overturn determinations as to the availability of corroborating evidence if a reasonable factfinder would be compelled to conclude it is unavailable). In *Lin-Jian*, for example, we reversed a denial of asylum claim in part because the IJ's "conclusory" decision failed to explain "why it was reasonable to expect [] corroboration." 489 F.3d at 192. Here, neither the IJ nor the BIA explained why it is reasonable to expect Mballa Bouba's husband to prepare a written, sworn statement from a tent in a refugee camp in a foreign country. The Government argues that because Mballa Bouba spoke with her husband by phone, he was "accessible," and because she managed to apply for a U.S. visa while living in Cameroon, she must have known whether mail service was available, Resp. Br. 20 & n.4—arguments the majority adopts wholesale. *Ante* 7. But these were not the justifications offered by the BIA and IJ. Instead, in patent disregard of the record, they simply concluded that her spouse should have provided a letter because he witnessed the events. *See Zavaleta-Policiano*, 873 F.3d at 246.

Finally, the "requirement that the applicant provide a reasonable explanation for the lack of corroborating evidence presumes that the IJ offers a petitioner an opportunity to explain the absence." *Lin-Jian*, 489 F.3d at 192 (internal quotation marks omitted). The IJ is required to "interrogate, examine, and cross-examine" the applicant. 8 U.S.C.

18

§ 1229a(b)(1).  But the IJ did not give Mballa Bouba an opportunity to explain why she had not provided an affidavit from her husband; indeed, neither the Government's attorney nor the IJ asked Mballa Bouba to explain its absence.  A.R. 101, 115.  More egregiously, the IJ gave Mballa Bouba no indication that the lack of a letter—or more accurately, the lack of an *explanation* for a letter—would be fatal to her claim.  A.R. 101, 115.

Because the BIA and IJ failed to offer "reasoned explanations" for their determinations about the reasonableness and availability of corroborating evidence and because they "disregard[ed]" that fact that her husband was living in a refugee tent, they abused their discretion in requiring an affidavit from Mballa Bouba's husband despite finding her credible.  *Zavaleta-Policiano*, 873 F.3d at 246 (quoting *Tassi*, 660 F.3d at 719).  In affirming these conclusions, the majority errs.

### B.

I turn next to the merits of Mballa Bouba's asylum claim.  To make out a claim for asylum, Mballa Bouba must show that she "ha[d] suffered past persecution or ha[d] a well-founded fear of persecution" on account of a "protected ground"[*] by an organization that the government of CAR is "unable or unwilling to control."  *Zavaleta-Policiano*, 873 F.3d at 246 (internal quotation marks and citation omitted); *accord* 8 C.F.R. § 208.13(b).

---

[*] The INA recognizes only five protected grounds:  "race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  Mballa Bouba's strongest claim for asylum rests on the protected ground of religion due to her Apostolic Christian faith.

19

The BIA and IJ abused their discretion in determining that Mballa Bouba had not demonstrated past persecution or a well-founded fear of persecution.

There is no set definition of persecution; the term is undefined by both Congress and the BIA. Under our precedent, persecution "involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition." *Baharon v. Holder*, 588 F.3d 228, 232 (4th Cir. 2009) (quoting *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005)). We have "expressly held that 'the threat of death qualifies as persecution.'" *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011)); *accord Li*, 405 F.3d at 177. In determining whether an applicant has made out a claim of persecution, the IJ and BIA must weigh all of the evidence; they cannot base a decision on "only isolated snippets of the record." *Baharon*, 588 F.3d at 233.

1.

An applicant can make out part of her asylum claim by showing past persecution due to a protected ground; this creates a rebuttable presumption of a well-founded fear of future persecution. *Zavaleta-Policiano*, 873 F.3d at 247 (citing *Naizgi v. Gonzales*, 455 F.3d 484, 486 (4th Cir. 2006)); *accord* 8 C.F.R. § 208.13(b)(1). Both the IJ and BIA found that the Séléka soldiers' threat of death or violence against Mballa Bouba and her family "did not rise to the level of persecution." A.R. 4. But this determination cannot survive appellate review because the IJ and BIA arbitrarily ignored "unrebutted, legally significant evidence." *Cordova*, 759 F.3d at 340.

20

First, Mballa Bouba testified (credibly) that a key component of her religious beliefs is frequent and boisterous payer, sometimes lasting all day or all night and sometimes so loud that "any passer-by could hear [her and her family] chanting and drumming." A.R. 355. Second, when the two armed Séléka soldiers came to her house, they already knew about her personal religious activities. A.R. 110–11, 356. Third, the two men were armed and pushed their way into her compound. A.R. 110, 356. Fourth, while holding weapons, they said that unless she stopped praying, they would be back. A.R. 111. Fifth, because of their reputation and weapons, Mballa Bouba knew that they were threatening to kill her unless she stopped praying. A.R. 112, 356. And sixth, Mballa Bouba changed her religious practices after they came, testifying that she prayed with her husband "quietly indoors" and "tried to live carefully." A.R. 356.

As stated above, our precedent clearly recognizes that "the threat of death qualifies as persecution." *Hernandez-Avalos*, 784 F.3d at 949 (quoting *Crespin-Valladares*, 632 F.3d at 126); *accord Li*, 405 F.3d at 177. The Government argues that Mballa Bouba has not provided any evidence of an "*actual* threat of death, only Petitioner's assumption that that is what the men were implying when they told her to stop praying," Resp. Br. 23—an argument the majority again adopts wholesale. *Ante* 7–8. But we have never required a threat of death or violence to be verbalized or explicit; indeed, we have noted that it is "unrealistic" to expect a gang to "neatly explain in a note all the legally significant reasons it is targeting someone." *Zavaleta-Policiano*, 873 F.3d at 248. Although the soldiers here did not "neatly" explain that they were going to harm Mballa Bouba due to her religious beliefs, there is a clear nexus between the Séléka, the threat, and her

21

religion: armed men pushed their way into Mballa Bouba's compound, she (credibly) identified the two armed men as Muslim Séléka members, the armed soldiers knew that she prayed, they told her to stop praying and that they would return if she persisted, and she understood them to communicate a nonverbal death threat. That the men did not formally introduce themselves or verbally articulate "the legally significant reasons" they were targeting her with violence is not fatal to her claim. *Id.*

In addition, several of our sister circuits have held that "having to practice religion underground to avoid punishment is itself a form of persecution." *Kazemzadeh v. U.S. Atty. Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009) (remanding asylum claim because BIA and IJ did not consider applicant's testimony that he would have to practice Christianity underground); *accord id.* at (Marcus, J., specially concurring) ("[T]he requirement that an asylum petitioner abandon his faith, or practice only in the dead of night, amounts to religious persecution."); *Woldemichael v. Ashcroft*, 448 F.3d 1000, 1003 (8th Cir. 2006) ("Absent physical harm, subjecting members of an unpopular faith to hostility, harassment, discrimination, and even economic deprivation is not persecution unless those persons are *prevented from practicing their religion* or deprived of their freedom." (emphasis added)); *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2005) ("[T]he fact that a person might avoid persecution through concealment of the activity that places her at risk of being persecuted is in no wise inconsistent with her having a well-founded fear of persecution. . . . On the contrary, it is the existence of such a fear that motivates the concealment."); *Zhang v. Ashcroft*, 388 F.3d 713, 719 (9th Cir. 2004) ("[T]o require Zhang to practice his beliefs in secret is contrary to our basic principles of religious

22

freedom and the protection of religious refugees."). Indeed, the Government conceded at oral argument that a person does not have to change her religious practice to become safe. Oral Arg. Tr. 20:39–21:05. These persuasive authorities reinforce Mballa Bouba's claim of persecution: after the two men told her to stop praying, she and her husband "prayed together quietly indoors" and "tried to live carefully." A.R. 356. The Séléka's threat of violence, therefore, constituted an imposition on her "freedom to practice religion openly and notoriously." *Kazemzadeh*, 577 F.3d at 1359 (Marcus, J., concurring).

Because the IJ and BIA "disregard[ed]" these key facts about Mballa Bouba's interaction with the Séléka, they abused their determination in finding that Mballa Bouba had not suffered past persecution. *See Zavaleta-Policiano*, 873 F.3d at 246. By affirming, the majority again errs.

### 2.

To demonstrate a well-founded fear of future persecution, an asylum applicant must demonstrate a fear that is both subjectively sincere and objectively reasonable. *Marynenka*, 592 F.3d at 600 (citing *Chen v. INS*, 195 F.3d 198, 201 (4th Cir. 1999)). "An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality[.]" 8 C.F.R. § 208.13(b)(2)(ii). To determine whether relocation is feasible, the IJ and BIA should consider several factors, including "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical

23

limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 208.13(b)(3).

Although the IJ and BIA agreed that Mballa Bouba had "a genuine subjective fear of persecution should she return to" CAR, both found that she had not established that her fear was "objectively reasonable." A.R. 64; *accord id.* 4. In particular, both emphasized that Mballa Bouba had "failed to show she could not reasonably relocate to avoid future harm inasmuch as the Central African Republic is approximately 80% Christian." A.R. 4; *accord id.* 64–65. In reaching these conclusions, however, the IJ and BIA applied the wrong legal standard and disregarded key facts.

To begin with, the IJ applied the wrong standards. The IJ claimed to analyze whether Mballa Bouba had demonstrated a "reasonable possibility" of future persecution. A.R. 63 (summarizing standard of review). This is an accurate statement of the law: An applicant "need not prove that it is more likely than not that he or she will be persecuted in his or her home country," *INS. v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); instead, he "need only show that his removal would create a 'reasonable possibility'—as low as a ten percent chance—of persecution," *Crespin-Valladares*, 632 F.3d at 126 (citing *Cardoza-Fonseca*, 480 U.S. at 440). But when purporting to apply this standard only a page later, the IJ found that Mballa Bouba had "not established by a *clear probability* that her fear of future persecution . . . is objectively reasonable." A.R. 64 (emphasis added). Requiring a "clear probability" in practice suggests that the IJ's prior recitation of the "reasonable possibility" standard was mere lip service. In addition, the IJ found that Mballa Bouba had "failed to demonstrate how she would specifically be targeted by the

24

Séléka while living within a Christian majority." A.R. 65. But this is not the test. An applicant need not prove a reasonable possibility of *individualized* persecution if she can establish "that there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant" on account of the protected ground. 8 C.F.R. § 208.13(b)(2)(iii).

In addition, a careful examination of the full record shows that Mballa Bouba would face at least a ten percent possibility of persecution on account of her religion because there is a "pattern or practice" of sectarian violence that particularly threatens civilians. *See* 8 C.F.R. § 208.13(b)(2)(iii). In concluding otherwise, the IJ and BIA "disregard[ed]" several key facts about Mballa Bouba's situation. *See Zavaleta-Policiano*, 873 F.3d at 246. The BIA and IJ also failed to consider whether Mballa Bouba "would face other serious harm in the place of suggested relocation," the existence of "ongoing civil strife within the country," and the country's weak "administrative, economic, [and] judicial infrastructure." 8 C.F.R. § 208.13(b)(3).

First, that CAR is a majority-Christian country is not categorical protection against anti-Christian persecution. Indeed, the IJ, BIA, and majority seem to forget that the (Christian) CAR President was only recently overthrown by the primarily Muslim Séléka minority, which proceeded to engage in a campaign of terror across the country that largely targeted Christian communities and ignited previously nonexistent sectarian strife. A.R. 500, 526, 538–43.

Second, even though the CAR civil war reached a *de jure* conclusion, Mballa Bouba still faces a "reasonable possibility" of future persecution due to persistent

sectarian strife. *Crespin-Valladares*, 632 F.3d at 126. The record is replete with evidence showing a pattern of retaliatory sectarian violence that falls heavily on CAR civilians. For example, violence broke out in Bangui in September and October 2015 after a young Muslim motorcycle taxi driver was murdered and mutilated. A.R. 271–73. In retaliation, Muslim militants attacked a Christian neighborhood; militants from both sides then "roamed the streets . . . setting homes ablaze and looting the offices of aid organizations." A.R. 271–72. From December 2013 to mid-August 2015, the United Nations "documented 3,232 civilian killings throughout the country, including 22 aid workers," as well as "79 civilians killed in Bangui between September 26 and October 16, [2015]." A.R. 143; *see also* A.R. 244–45 (discussing reprisal attacks after the murder of two young Muslims); A.R. 151, 285–86 (describing how the anti-Balaka beheaded a 19-year-old Muslim youth, which triggered "reprisal attacks by young Muslims and ex-Seleka rebels inside the Christian neighborhood of Bambari"); A.R. 262 (describing how the Séléka killed eight civilians in a camp for internally displaced people). As the State Department observed, the reprisal killings "included summary executions and deliberate and indiscriminate attacks on the civilian population." A.R. 143.

Third, that the Séléka and Anti-Balaka each occupy half of the country by no means ensures that Mballa Bouba could safely relocate to the Christian half. Nor does the return of some people to their homes indicate that persecution is unlikely. Instead, that two violent militias occupy halves of a country signals the ineffectiveness of state authority and the inability of the state to prevent future violence if and when the boundaries shift. For example, when the town of Bria fell under control of the Séléka,

26

they "refused to allow the presence of any government representatives or the holding of local elections in areas under their control." A.R. 151. A joint operation by international forces in February 2015 to drive the rebels out of Bria "exposed nearby villages to reprisal attacks" by the Séléka. *Id.* The U.S. State Department further detailed the collapse of CAR's administrative and judicial infrastructure, noting that the court system "barely operate[s]" after being plundered by the Séléka and that the police and gendarmerie have "limited or no presence in many areas of the country." A.R. 143–71.

Finally, the IJ, BIA, and majority ignore that Mballa Bouba would be a particular target because of her and her husband's work as missionaries and because her religious beliefs involve frequent and boisterous prayer. The record shows that religious leaders are particular targets. For example, in October 2015, the President of CAR's Evangelical Alliance, Rev. Nicolas Gierekoyame-Gbangou, narrowly escaped an assassination attempt, apparently in retaliation for the death of the Muslim taxi driver in Bangui. A.R. 268. There is more than a "reasonable possibility" that Mballa Bouba would likewise face further violence and persecution unless she changed her spiritual calling and sincerely held religious practices. *See Crespin-Valladares*, 632 F.3d at 126.

In sum, the IJ and BIA abused their discretion in concluding that CAR's Christian majority and current geo-sectarian division mean that Mballa Bouba lacked a well-founded fear of future persecution as an Apostolic Christian in CAR. As the majority fails to recognize, "any reasonable adjudicator would be compelled to conclude to the contrary." *Zavaleta-Policiano*, 873 F.3d at 246 (internal quotation marks omitted).

27

III.

The IJ and BIA abused their discretion in denying Mballa Bouba's asylum claim: they "disregard[ed] important aspects" of Mballa Bouba's claim and failed to "offer a reasoned explanation" for their decisions. *Zavaleta-Policiano*, 873 F.3d at 246 (quoting *Tassi*, 660 F.3d at 719). Because the majority affirms these errors, I respectfully dissent.